Case number 24-12-11, United States of America v. Gregory Knuuttila. Oral argument not to exceed 15 minutes per side. Mr. Graham, you may proceed for the appellant. Good afternoon, your honors. My name is Scott Graham on behalf of Mr. I'm going to pronounce it Knuuttila because that's the way he pronounces it. So Knuuttila is what it's always been. So we can't say Nutella? I would prefer Knuuttila. This is, I think this is a fully brief case, but I have a few thoughts I'd like to offer to the court. I don't view this as being a normal case in any way or form. I consider the police work here to be somewhere between inconsistent and certainly insufficient to establish probable cause to stop and search a car. And I'd like to start right there with the use of the term. Well, why don't you rationale after reading your appellant's brief? Because it didn't seem to me that you actually challenged the district court's rationale, which was that there was reasonable suspicion that there was a drug run. So if you don't even challenge it, we could affirm on the basis of waiver or forfeiture rather than even reaching the merits. So why don't you respond to that first? First, your honor, and as I attempted to address in the reply and I'd like to highlight those points for the court, I think I did challenge the rationale all the way through. The basis for this stop and search was always tied to information that I guess the authorities claimed that they had. We did argue that the information that the government relied on was inadequate to establish probable cause. Did you cite any authority to support that proposition in particular in your briefing? I don't know if there was a specific case cited. I'd have to go back and check. So we have a motion to suppress. We have a two-day evidentiary hearing. The government's theory of the case is shifting back and forth between overall probable cause and of course where it started, which was these outstanding arrest warrants for the passenger. The case is argued to the district court in which there's substantial argument about the lack of probable cause. Yeah, but you knew on appeal what the basis of the district court's rationale was. Even if there was some confusion, that might excuse inadequate briefing in the district court. But once the district court issued its ruling suggesting that it was not going to rely on the arrest warrant or the logline issue, it was going to rely on the reasonable suspicion that this was a drug run happening spontaneously or contemporaneously with the stop. Don't you think you had a duty to provide some reasoned analysis on why that was insufficient? I guess I thought we did and also, Your Honor, I understand that the district court said in one part of the opinion it's not really relying on the arrest warrants and it's not really relying on the fog line stop, but in another portion it indicated the fact that they were relevant to what the court is doing. So I think there was confusion there. Well, the district court kind of had to at least mention the two rationales, potential rationales for the stop, because that's what you almost exclusively relied upon. But I think the problem that we're all having that we're trying to express to you is that you don't seem to have actually confronted the five or six different reasons that the police say they relied upon to conclude that this was just another one of his drug runs to Wisconsin or wherever the other place was. And even in the reply brief, you really don't take on any of those reasons. And the evidence, frankly, seems largely overwhelming that this guy was on a drug run and the police knew about it for five or six different reasons, and that's why they pulled him over. Now, secondarily, under their stacking theory, did they mention the other two things? Yes. But every time it comes up in any place in this record, this was a drug run, they knew it, they pulled him over. So what do we do with that? I think, I mean, I have to begin by responding, Your Honor, by saying that the argument offered regarding the flaws in their overall reasoning, it speaks for itself in the papers. I understand that. But, in fact, the question here is, when we look at the totality of the facts, is whether or not there is probable cause. And the probable cause, I guess, that is based upon information that's not supported with any credibility allegations. They've got controlled buys going back to 2019. They've got a controlled buy that is not, that I can see, supported by a statement from a credible witness. They have the fact that the vehicle is moving to, and does move, to Vinelander. Well, they also, they had the fact that an informant had fronted $1,500 in order for your client to provide, what, two ounces of meth, and they knew that through his communications that they were monitoring, that he was attempting to do so. I don't think they knew that. They, they, well, I mean, the reason they had, and I think it's reasonable suspicion for criminal activity for the stop, isn't it? Not at all, Your Honor. Not here because the decision had already been made to search the vehicle. That, that was the distinction I was going to make. If, in fact, they're going to stop the vehicle because they've got some suspicion that criminal activity is afoot, well, then it is reasonable suspicion. My, my argument... Doesn't, doesn't the fact that they had the drug dog on standby and showed up 50, 45 seconds later provide really good cooperation that they thought this was a drug run and they were going to find drugs in the car? Why else would they have this drug dog on standby, 45 seconds away, because he might go over the fog line? It, it, it shows that they, that they believed, they knew they were going to stop the vehicle. I guess they said that repeatedly. They knew they were going to stop and search the vehicle, which is a reason for my probable cause argument, but moving to your point, Your Honor, yeah, they were going to do a full search of that vehicle. And so the question becomes, have they explained the basis for that full search of the vehicle? Well, they explained five different reasons why they thought it was a drug run. Well, but that doesn't mean that those reasons were legitimate or that they established probable cause. Well, sure, that's true, but, but so, so what do you think your best argument is that this was all a ruse and they really didn't have a basis to believe it was a drug run? They lied about why they stopped the vehicle. Where did they lie? Officer Peterson, the person who made the stop, stops the vehicle and then writes a report about what he did. The report is someplace between inaccurate and false. For example, if we were here on a search warrant, there'd be a Frank's issue here. We know that he did that. We know that the testimony is that the report is incomplete and inaccurate and we know, and we know, and we know his explanation. Correct, Your Honor, and I guess the question I have is, how far can they go in simply making up facts to go in police reports or leaving them out and maintain integrity in the, in the system? When, when Peterson is questioned about... We should throw this stop out because the report didn't mention the drug run analysis, if that's true, but it did mention these, these other two potential reasons. For that, we should throw this stop out when there's this other seemingly overwhelming evidence it was a drug run? Well, I, I would disagree with, with a conclusion that there was overwhelming evidence. I understand the court's going to evaluate that and make a decision about that, and if the court determined that there was separate, independent, overwhelming evidence that was credible and that had an adequate basis, both in specificity and credibility, that this was a drug run, I, I understand that argument. I understand that point. Well, what, what in her analysis did Judge Neff get wrong when she found probable cause? What did she specifically err in that was wrong as opposed to you just disagree with her conclusion? Well, she begins by talking about activity that becomes part of this analysis that goes back to 2019, and that is pure and simply stale. I, I don't know how someone supposedly commits a crime in 2019, nothing's ever done about it, and then years later, it's going to be the basis for a stop. So I disagree that the 2019, anything should have been... Okay, so that one doesn't count. Okay. The, the $1,500 reverse buy or whatever term they used, my reading the record is that there was not an adequate basis for credibility from that alleged CI. So that has to go out, and that was certainly a key fact. The fact that a vehicle is going, does go to Rhinelander, I, I don't know of a criminal explanation for that, and so I think that was wrong. Okay, thank you. And I'm sorry, my time's up. Thank you. You'll have your full rebuttal. Thank you. Okay, we'll hear from the government, counsel for the government. Good afternoon, your honors, and may it please the court, I'm Catherine Delzel on behalf of the United States. This court should affirm both Mr. Cadoodle's conviction and his sentence, and this is a case, I agree with opposing counsel, that it was fully briefed. I recognize there are a lot of different issues in the briefing. I'm happy to take direction from the court right out of the gate if there are specific areas of concern that you'd like me to address. Otherwise, I'm happy to kind of give my general thoughts on all of the issues. I have a question, or I have a couple of thoughts. One, if we assume that there was no waiver or forfeiture of the reasonable suspicion issue, is it the case that any time we've got good information, let's have a couple of facts just assumed. We've got good information that a target of an investigation is a drug dealer, and part of that good information is that the individual was involved in controlled buys. So those were observed by officers and all of the things that happen in a controlled buy, that happens. And you've got good information that the target of the investigation is in fact going to re-up or get more drugs, and it's going to be from Detroit to Chicago. You don't know the precise date that it's going to happen, but it's going to be soon because he's been fronted some money so that he can actually bring something back to a specific customer who happens to be someone who's cooperating with the police. You get a tracker on the car. Sure individual goes to Chicago. Can the police stop that car because he went to Chicago? So I would say there was more evidence in this case than that. The confidential informant who gave the controlled front of $1,500, pardon me, there were text messages that that person supplied to law enforcement saying basically, Mr. Canoodle was saying, I'm going soon, I'm going soon, I've hit a snag, I'm going to send someone or go myself, I'm going soon. So in your... It was days later, right? Right. And so they were monitoring this person with a ping. So in your example, if it's Detroit to Chicago, which seems a little bit different just because there's more normal traffic kind of down there. I mean all those days in between when the controlled front happened and when he eventually went to Rhinelander. And of course, police knew that Rhinelander was a specific location for picking up meth, which is a little bit different than Chicago. I mean, there are kind of a lot of things that one might go to Chicago to do. But they did the controlled front. There were several days that passed, but that whole time they were monitoring with the ping warrant, his phone. I guess part of the issue that I'm having is I don't, I'm not aware of cases, and maybe they exist, but I'm not aware of cases where you've kind of done all of that, even wiretap cases. I mean, I've seen wiretap cases where you've got constant conversations between individuals about what's going on, when, and those kinds of things. And I'm gonna head to, let's say it's Branson, Missouri. Let's not make it Chicago. Let's not make it a big city or anything like that. And you've got information that an individual is going for a pickup. When they go for that pickup, one of two things happens. One, either there's some surveillance by some type of law enforcement who sees the person go to a particular location and some suspicious activity happen. Obviously, you know, the officers are not necessarily there seeing that it's drugs that are changing hand, but they see some suspicious activity that confirms, aha, yeah, we think that this pickup actually happened. And then there's a stop. Or they say, hey, this person was supposed to be traveling. They went to Branson, Missouri, as we suspected that the individual was going to do. They call the local state troopers and say, this is the vehicle. Watch that vehicle. Then they wait for a traffic violation. The traffic violation occurs and that happens. I'm just not so familiar with the scenario in which you've built, let's say it's a great investigation, you've got lots of information, and the person goes to the city or town where you thought they were going to go. You don't even have the specific location. You've got nobody watching them. You don't know what happened there. You just know they stayed for a short time, which is meaningful. I get that. That's meaningful. But we haven't, I haven't seen cases where there's been a stop after that and then reasonable suspicion. I would agree that the short duration of the stop in Rhinelander is meaningful. And again, it's a specific location that they know his source of supply is in. They know he goes to Rhinelander, which is just under a three-hour drive. He stays for an hour. He turns around and he comes back. And of course... This would be a bit of a first, wouldn't it? This would be a first for there to have been no observation whatsoever of what happened while the person was at the location where you suspect that the dropper, the exchange, was going to happen. And the person just gets stopped based upon kind of historical information of what officers thought was going to happen. I'm not sure it would be a first. Can you point me to a case like that? I knew that was going to be your Honor's question. I can't point you to a specific case where, you know, the court focused on whether they observed anything by the person at the location of the stop. But what I would say and emphasize is that reasonable suspicion is a very low bar. And they had a lot of information here. Again, I mean, as your Honor is familiar with, they had three controlled buys very close in time to this. They had the controlled front. They had text communication the whole time. They were monitoring him. He was not going anywhere outside of Houghton. And then, you know, you've got informant saying he's going to go on this run imminently. And then all of a sudden he starts going to Rhinelander. He stays for an hour and he comes back. So reasonable suspicion is just... It's a very low bar. It's hard for me to picture what else he is doing given that information other than a drug run. And so that's, I believe, how I would answer your Honor's question. What do you do with counsel's response that it's actually not reasonable suspicion as the test but a probable cause instead because of the intent to search the car throughout? I don't think that it was probable cause, although I do think there was probable cause here. But I think to stop a car, it just requires reasonable suspicion that criminal activity is afoot. And so they were entitled to stop the car, ask him questions. Of course, once they stopped the car, he gave inconsistent information about where he had been and was just, in general, acting suspicious. I think they asked him to get out of the car multiple times. He wouldn't do it, wouldn't give his passenger's name. And again, within 45 seconds, they had the drug dog come around and alert on the car. So by the time they did search the car, they had probable cause. So I think all that is needed here is reasonable suspicion. So how does it, how does, because this is a, the usual scenario is you have a stop for a traffic infraction, but put the traffic infraction aside. And then you have to ask, when did reasonable suspicion get generated from the conversation to prolong the stop in order to allow for a drug sniffing dog? But here, would you say because the purpose of the stop was drug related, that as long as you have reasonable suspicion to engage in the stop, and if the reasonable suspicion is tied to drug manufacturing or distribution, that you can wait some type of reasonable amount of time for the dog and you don't even need to ask questions or maybe ask questions to see what's going on. But, but, but how do we deal with the Rodriguez issue, which is the, the, was there a reasonable delay? I, I agree. I, I don't think the Rodriguez issue matters in this case because they had reasonable suspicion from the outset. And then what they did to dispel the reasonable suspicion is they called a drug dog. And as your honor notes, this is a drug case. So that is exactly what they would do. So I don't think that the questioning or the length of the traffic stop ultimately matters in this case. It does if you don't have reasonable suspicion at the start of the stop, but here they did. So, um, well, even if it mattered, there's no way they could have completed the process of giving them a ticket for crossing the fog line at 45 seconds. That's correct. This, there was an extended hearing on this probable cause reasonable suspicion question, wasn't there? Yes. And did Tadgerson testify? I do not believe. No, she did not. She did not. All right. Well, it is interesting. I agree with Judge Davis that, um, the fact pattern that we normally see is, as I said, the traffic stop, is there just not, um, precedent either way in this context. So we have to look to more general reasonable suspicion principles, I guess. Um, so what I'm saying is, um, usually in the, in the, um, um, uh, traffic stop context, it's usually based on moving violations, not based on reasonable suspicion of, uh, drug distribution or some other unrelated to driving, um, crime. Right. Um, and so most of the cases don't seem to be really all that helpful. So in some respects, I agree with her that this is a first and you seem to acknowledge that point. Um, I, I don't know that I would agree that it's a first. I recognize I don't have a case to point you to, but I think anytime that you have reasonable suspicion, police are allowed to do a Terry stop. Um, so if you were walking down the street, police could do a Terry stop, question him. I don't see why it's different that he's in the car. Um, and of course, police obviously have a lot of reason to think he's in the car with a large quantity of methamphetamine. Um, but they can stop him in the car just as they could stop him walking down the street, as long as they have reasonable suspicion that he was, what was the, so maybe we need to go back to first principles. What was the reasonable suspicion in Terry? Wasn't it just they were casing? Was there any other evidence other than just walking back and forth? Uh, um, I forget what type of store it was that they were planning on robbing. I remember it was surprisingly meager evidence and Terry and I don't remember the exact scenario, but I think your honor is correct as they were casing the store. They kind of walked back and forth a couple of times. It looked suspicious to police. Um, which confirms that reasonable suspicion is a very low bar. Um, so here certainly it was surmounted by all of these confidential informants and the ongoing communications with Canoodle on the lead up to this particular trip to Wisconsin that he was imminently going to go on this trip. And there were multiple informants telling police that and showing them text messages with Canoodle himself. Um, and of course there's the training and experience testimony that staying in only an hour in some place, um, is corroborative of drug trafficking. What? How do you think the report should your friend on the other side suggested the police maybe have credibility issues because of this later report that didn't mention the drug investigation? Um, how does that interact with kind of ran in the objective reasonableness test? I disagree. I think the test is objective reasonableness. I don't think that there was any misconduct here, um, or bad faith. Um, reading the suppression transcript as a whole, it's very clear what happened, which is that there's this upset team, which is a drug specific multi jurisdictional task force. And they were the ones leading this investigation into Mr. Canoodle. Uh, and they called a component of the Michigan State Police. I think it was called the hometown task force, um, hometown security for something like that. Um, they actually executed the stop and the officer who executed the stop testified that, um, you know, to the phenomenon of whisper, whisper stops and how, um, they tried to build their own case in addition to the information they knew from upset. Um, so they would try to point to the fog line crossing, um, the passengers warrants. Um, part of that is to, you police report that shows that they had reasonable suspicion or probable cause to stop this vehicle. Um, but not so much that it puts confidential informants in the underlying. I can totally understand wanting to be a little coy when you approach the vehicle. Um, given the dangers, like you don't want to just go up and say, oh, we stopped you because we think you have a whole bunch of drugs. Right. And of course they had information. But was there a concern that the police was the police report immediately a public document that could, could have been disclosed or would there have been, why not? Why isn't the better approach to say, put confidential information in there, but seal it until the appropriate time. Um, and I don't know the answer to that, your honor. I know that it was testified at the suppression hearing, um, by the officer who did the stop that typically his report would be the first that would be seen. Uh, he did testify though that all of the reports would eventually come out, including the upset reports. Um, so as to exactly why they do this practice, um, I don't have a good answer for that. Um, but I do know there was testimony that typically the stopping officers report would be the first that would come out. And of course the timing can matter. You know, if you have an ongoing investigation into a drug trafficking ring that involves multiple people, um, even if all of the reports are going to come out eventually in an investigation, you might still want to keep the confidential informants, um, information secret for as long as possible. Uh, but again, something just as simple as in many of these cases, I'm guessing the person just simply gets picked up and they go to jail and they plead guilty. They're never, it's never becomes an issue. So why would you put all of this stuff up front in the majority of these cases? But that's just an observation. What, what I really wanted to ask you is it seems to me a lot of our discussion is coming down to, do you need something more than what was present here? Um, in order to make this stop when you didn't see a hand to hand transaction or something like that. But there's all kinds of case law that says that when you pull somebody over for a traffic stop, if it's a pretext, doesn't matter. No harm, no foul. So you don't have to have a legitimate reason to pull somebody over. It can be a pretext. That's correct. But you still then look to see, you look to see what else you had, uh, to see if that provides reasonable suspicion, right? Correct. Because the vast majority of these cases when people are going, say from Detroit to Chicago, they know that there's a drug run going on. They know there's a car in front, a car in back and a car in the middle. They stopped the car in the middle because that's where the drug dealer usually is. They, uh, they, they try to come up with some sort of traffic reason to pull them over. But we say it doesn't really matter. That's correct. But doesn't, uh, in that scenario though, the pretext would have to be valid. So what I mean by that is you actually have to be, there has to be probable cause that you have violated the traffic laws. And so if we did rely on the fog line thing, then that would move all of this. Um, but the district court thought that the fog line would not be, uh, I guess touching the fog line would not be a basis for a stop. Um, that's correct. Uh, I mean the district court did focus on reasonable suspicion. Um, and the district court did drop a footnote, um, to the effect that she was not relying on the passenger warrants, but the government did rely on all of those things below. Um, we just think it's obvious that there is reasonable suspicion here, although recognizing, um, that the panel had some questions on that. But yes, I think if any of those bases are valid, the stop stands. Okay. Any other questions? Nope. Thank you, counsel. Thank you. Well, here, uh, uh, the rebuttal. Um, let me jump around a little bit on the question of whether the report would have been released so that people could have seen it under the Michigan, uh, FOIA police reports are not public subject to public disclosure while the investigation is ongoing. Once the investigation is done, they could be the subject of a FOIA request, not during, um, or more accurately, the agency could deny the turnover while the investigation is ongoing. But if you acknowledge that the subjective reason that the officer gives is not something that for, you know, our purposes, we actually care about, what difference does it make if the wrong reason for the stop is noted on the report? I think it gets back to this credibility question. And if I could, Your Honor, well, you're not asking us to make any credibility determinations, are you? Well, the apparently the credibility as to the police officer said various things. So what does this kerfuffle about what was in the report? What, what part of what the officers said or did is then subject to legitimate question on this record? The matter and the motion started with, you know, with us focusing on, you know, the basis for the stop. At one point, Officer Peterson, officer making the stop, and I would point to page ID 471, where he's asked, anyone talk to you about the fact that you created your own basis for the stop? And he says, no, it's clear he created his own basis for the stop. Um, so, uh, it's the credibility of what really happened. I don't even get that, Mr. Graham. He, we're playing a word game about who created the basis of the stop. The facts created the basis of the stop. Now you can argue that they didn't happen, or you can argue they happened, but cumulatively or individually, they're not enough to create reasonable suspicion. That's, that's fair. But why does this, why does this incomplete report then raise a legitimate question about what actually happened here? To the extent that the overall police approach to this case, um, includes false statements and reports. I'm getting to the credibility of the overall investigation, the overall allegations that have been made. It's, it really does not go beyond that. Peterson said what he said, and, uh, may or may not relate to what other officers said that they knew. Um, it's just a very troubling, very troubling thing. What he said wasn't false. It might have been incomplete. So you're asking us really to issue an opinion that says if you're not fully forthright and complete in the initial police report, then that taints everything that happened, uh, up prior prior to that. That's what we would be saying, isn't it? It would depend on, uh, whether you thought that what he said was false. He says, and another officer says it was just incomplete. Well, it wasn't just incomplete. It was false. So, um, what, what specifically was false in that report aside from an arguable omission? His statement about when he made up his own basis for the stop, he made that up. He admitted that he made up the basis for the stop, the warrant and the fog line. Yes. Mhm. What do you mean by made up? That's she had a warrant. Protect stops happen all the time. That was the point. If you, if you mean by made up that you, you are really stopping them for drug concerns, but they're speeding. So you're ostensibly stopping them for speeding. Wren says there's nothing wrong with that. Well, if in fact, if in fact this was a standard pretextual stop, this was, there was already a decision to search everything we've talked about here. There is a pretextual stop to give the officers a chance to talk with the occupants of the vehicle for a reason other than the basis for stop and see if they can come up with some evidence that leads to reasonable suspicion. That's not what happened here. This is not a reasonable suspicion case. It is a probable cause case. One example I would tie in is the canine. The canine was part of the team. The canine wasn't called to arrive in 45 seconds. The canine officer was part of the team. There was going to be a search. And that's, that's my distinction on the reasonable suspicion. Well, that's fine, but we still go back. And even if it's a probable cause case to see if there was adequate probable cause to stop that car with the full intention of having the dog do a sniff. Right. I agree. And I mean, at least from the police officer standpoint, you can't say that they intended to search that car regardless of whether the dog alerted, at least they're going to bring in a dog and the dog alerted. Your Honor, I think the record shows they were going to search that car no matter what. Why'd they bring in the dog? I'm sure they would love to have that, that, you know, that additional reason. We're not, weren't dealing with the truth about what was really happening here at all. Thank you very much. Thank you. The case will be submitted. Mr. Graham, I see you're a CJA appointee. We thank you for your service and both of your excellent arguments today.